# AFFIDAVIT IN SUPPORT OF APPLICATION FOR CIVIL FORFEITURE

I, Kevin L. Seiler, being first duly sworn, depose and state as follows:

***Background of Agent:***

1.  I am a Special Agent ("SA") of the United States Fish and Wildlife Service ("FWS" or "Service"), Office of Law Enforcement, and am therefore an "investigative or law enforcement officer" within the meaning of Title 16, United States Code, Section 3375. As such, I am a Federal Law Enforcement Officer within the meaning of Rule 41(a), Fed. R. Crim. P. I have been so employed for approximately 4 years 7 months. During that time I have worked as a Special Agent in Memphis, Tennessee, the Territory of Guam, and Houston, Texas. Previous to that I was employed as a Service Wildlife Inspector for approximately two years. Prior to that, I served on active duty as a Commissioned Officer in the United States Air Force and Special Agent for the United States Air Force Office of Special Investigations for 6 years. Before that, I performed 4 years of enlisted service in the United States Air Force as a Law Enforcement Specialist and was assigned duties as a Security Police Investigator. I began my law enforcement career in 1991 as a Reserve Law Enforcement Officer for the City of West Melbourne, Florida and a Reserve Wildlife (Law Enforcement) Officer for the Florida Game and Fresh Water Fish Commission, and a Law Enforcement Officer for the Town of Melbourne Village, Florida. I have approximately 20 years of experience in the enforcement of Federal and State laws.

1

2. As a Special Agent with the Service, I have conducted and assisted in numerous criminal and civil investigations, including many that involved the unlawful import of wildlife and plants from various foreign countries into the commerce of the United States.

3. I am familiar, based on my training and experience, with the laws and regulations primarily enforced by the FWS, such as the Lacey Act, Title 16, United States Code, Sections 3371, et seq.; and the Endangered Species Act ("ESA"), Title 16, United States Code, Sections 1531, et seq. I am also familiar with additional laws and regulations that may be applied in cases involving illegal trade in wildlife and plants, including the prohibitions against smuggling and import contrary to law, Title 18, United States Code, Section 545.

4. During my employment with FWS, I have had extensive training in, and have conducted investigations into violations of Federal wildlife related criminal laws, including participation in the execution of many search warrants on the residences and businesses of persons suspected of illegally taking, possessing, and trafficking in wildlife and plants. As a result of my training and experience, as well as the corporate knowledge and experience of other Service agents across the United States, I am familiar with the methods commonly used by wildlife dealers and traders to collect and sell wildlife and plants in interstate and foreign commerce.

*Property to be forfeited:*

5. I present this affidavit in support of the Verified Complaint *In Rem* seeking forfeiture of items seized on or about June 29, 2011, when the FWS seized the following property:

    a. Twenty five (25) bundles of sawn Indian ebony wood (*Diospyros ebenum*) in the form of sawn logs, totaling one thousand two hundred and fifty (1,250) pieces, sawn to the dimensions of 510-530 x 75/70 x 10mm and 510-530 x 72/62 x 10mm, imported into the United States from India, and arriving in the United States on June 22, 2011 via transport on American Airlines under Air Way Bill 589 2025 5804

(hereinafter collectively referred to as "Defendant Property").

*Basis of knowledge:*

6. This Affidavit is based upon my personal knowledge, a review of evidence obtained during the course of this joint investigation with FWS and the Department of Homeland Security, United States Immigration and Customs Enforcement, and information provided to me by other law enforcement officers and civilians throughout the course of this investigation including but not limited to import documentation, eye witness accounts regarding the Defendant Property, and interviews with civilians and law enforcement. Because this statement is being submitted for the limited purpose of an application for the civil forfeiture of illegally imported plants, it does not contain each and every fact learned by me and other law enforcement officers during the course of the investigation. It contains only a limited recitation of facts needed to establish a preponderance of the evidence for the civil forfeiture of the illegally imported plants.

## Background

*Statutes:*

7.  The Lacey Act, 16 U.S.C. § 3372(a)(2)(B)(iii), makes it unlawful for any person to import, export, transport, sell, receive, acquire, or purchase in interstate or foreign commerce any plant taken, possessed, transported or sold, in violation of any law or regulation of any State or any foreign law, governing the export or transshipment of plants. Section 3371 defines the term plant and plants to mean any wild member of the plant kingdom, including roots, seeds, parts, or products thereof, and including trees from either natural or planted forest stands.

8.  The Lacey Act, 16 U.S.C. § 3372(d), makes it unlawful for any person to make or submit any false record, account or label for, or any false identification of, any fish, wildlife, or plant which has been, or is intended to be – (1) imported, exported, transported, sold, purchased, or received from any foreign country; or (2) transported in interstate or foreign commerce.

9.  16 U.S.C. § 3374 provides for the forfeiture of plants imported, exported, transported, sold, received, acquired, or purchased contrary to the provisions of 16 U.S.C. §§ 3372(a)(2) and 3372(d).

10. 18 U.S.C. § 545, makes it unlawful for anyone to knowingly or fraudulently import or bring into the United States any merchandise contrary to law, or to receive, conceal, buy, sell, or in any manner facilitate the transportation, concealment, or sale of such merchandise after importation, knowing the same to have been imported or brought into the United States contrary to law. 18 U.S.C.

4

§ 545 also makes merchandise introduced into the United States in violation of this statute forfeitable to the United States.

11. 19 U.S.C. § 1595a(c)(1)(A) provides for the seizure and forfeiture of merchandise which is smuggled, or clandestinely imported or introduced into the United States contrary to law.

*Code of Federal Regulations:*

12. United States Customs and Border Protection issued tariff classification ruling NY 881630 under the provisions of Part 177 of the Customs Regulations (19 C.F.R. § 177), on January 26, 1993. The ruling pertains to sawn Indian rosewood (*Dalbergia latifolia*) and sawn Indian ebony (*Diospyros ebenum*) imported for the purpose of manufacturing the sawn wood pieces into parts called "finger boards" for guitars or violins. The ruling states that these pieces of sawn wood, even when referred to as "finger boards" (before they are actually manufactured into "finger boards") are classified under the HS code 4407 (attached as Exhibit A and incorporated herein).

*Harmonized System:*

13. As explained by the World Customs Organization, the Harmonized System ("HS") is a multipurpose international product nomenclature. The HS contributes to the harmonization of Customs and trade procedures. It is extensively used by governments for (among other things) monitoring of controlled goods, rules of origin, freight tariffs, and transport statistics. It is a "universal economic language and code for goods and an indispensable tool for international trade." (Attached as Exhibit B and incorporated herein). I am aware

that HS code 4407 is a code within the HS which refers to all forest products which conform to, "Wood sawn or chipped lengthwise, sliced or peeled, whether or not planed, sanded, or end jointed, or a thickness exceeding 6mm." The Republic of India prohibits the export of forest products classified under HS Code 4407 for all plant species, harvested in India, without exception. Although The Republic of India prohibits the export of sawn wood, harvested in India, under the HS 4407 series, Indian law allows the export of wood veneers classified under the HS 4408 series.

**Relevant Indian Law:**

14. <u>The Foreign Trade Development and Regulation Act (FTDG Act) of 1992</u>, as amended by <u>The Foreign Trade Development and Regulation Amendment Act of 2010</u>, established the authority of the Ministry of Commerce and Industry to enact a foreign trade policy for the Government of India.

15. <u>Foreign Trade Policy, 27th August 2009 - 31st March 2014, w.e.f. 23.08.2010, Government of India, Ministry of Commerce and Industry, Department of Commerce</u> ("FTP") incorporates provisions related to export and import of goods and services, and has an effective date of August 27, 2009 and remains in force up to March 31, 2014, unless otherwise specified. The FTP specifies: "2.29 All goods may be exported without any restriction except to the extent that such exports are regulated by ITC (HS) or any other provision of FTP or any other law for the time being in force." The ITC (HS) refers to the International Tariff Code Harmonized System which is included as an annex to the FTP.

6

16. A review of the ITC (HS), as referenced in the FTP, reveals that the export status of forest products conforming to the HS code 4407, for all species of plants harvested in India, including wood consisting of either Indian rosewood (*Dalbergia latifolia*) or Indian ebony (*Diospyros ebenum*), is "Prohibited" and "Not permitted to be exported." No exceptions were cited relevant to this export prohibition under Indian law. Further research of annual supplements to the FTP and all other published laws and regulations of the Government of India, posted on India's official website for the international import/export community dgft.gov.in, also reveals no exceptions to this export prohibition.

## Investigation

*The export documents for the Defendant Property were falsely labeled to allow its export from India by Atheena Exports.*

17. The investigation revealed that according to an Air Way Bill, the Defendant Property was exported by Atheena Exports of India to the ultimate consignee Theodor Nagel, GMBH (of Hamburg, Germany), with a note to notify Luthiers Mercantile upon import. The shipment was marked for direct transport in interstate commerce to Nashville, Tennessee following United States Customs clearance. The actual final consignee in Nashville, Tennessee was not identified in the export paperwork. However, at a later date, Natalie Swango, General Manager of Luthiers Mercantile International, Inc. ("Luthiers Mercantile") advised FWS Inspector Kim Theurer that the actual ultimate consignee was Gibson Guitar for the Defendant Property, and this was confirmed by the Lacey Act Declaration related to the import of the Defendant Property.

18. A copy of the Indian export declaration, dated on or about June 10, 2011, documented the export of the Defendant Property from the Republic of India prior to its import into the United States. The export declaration, prepared by the exporter for presentation to the Indian Customs authorities, falsely classified the Defendant Property under HS code 9209.92.00 (finished parts of musical instruments). The Defendant Property does not fall within the description set forth under HS code 9209 and the use of this tariff code concealed the true nature of the Defendant Property. The true classification under HS code 4407 would have prevented the export of the Defendant Property from India.

19. From a review of the paperwork accompanying the Defendant Property, Inspector Theurer determined that the shipment was exported from India and contained twenty five (25) bundles of Indian ebony wood (*Diospyros ebenum*) in the form of sawn logs, totaling one thousand two hundred and fifty (1,250) pieces, sawn to the dimensions of 510-530 x 75/70 x 10mm and 510-530 x 72/62 x 10mm. The shipment was imported into the United States on June 22, 2011, via transport on American Airlines under Air Way Bill 589 2025 5804.

***The import documents were falsely labeled to allow the import into the United States of the Defendant Property by Luthiers Mercantile.***

20. United States Customs entry declaration CBP Form 3461, for the shipment of the Defendant Property, listed Luthiers Mercantile (of Windsor, California) as the importer of record. CBP Form 3461 declared Luthiers Mercantile as the ultimate consignee, in contradiction to the Lacey Act declaration and other paperwork listing the final destination of the Defendant

8

Case 3:11-cv-00913   Document 3   Filed 09/27/11   Page 8 of 18 PageID #: 20

Property to be Nashville, Tennessee. In addition, the imported Defendant Property was falsely declared on CBP Form 3461 as "VENEER SHEET <= 6MM OTH, OT" and further listed the HS code as "4408.90.0195", to match the false description. Because the description and HS code beginning in "4408" are fraudulent, the shipment paperwork as to the Defendant Property was deceptive, concealed the true nature of the import and fraudulently presented as a shipment that would be legal to export from India, even though it clearly was not a legally exported or imported shipment.

21. The Import documents reflect that on or about June 27, 2011, Luthiers Mercantile International imported the Defendant Property from India into the United States, and presented this shipment for Customs clearance at the Dallas, Texas Port of Entry. The shipment was detained by the United States Department of Homeland Security, Customs and Border Protection ("CBP") Officers for suspected violations of the Lacey Act, and referred to FWS Inspector Theurer.

22. The shipment of Defendant Property contained a Certificate of Origin from India, for twenty-five (25) bundles of Indian ebony wood (*Diospyros ebenum*) The wood was listed on the form as "Indian ebony finger boards", totaling one thousand two hundred and fifty (1,250) pieces, with the dimensions of 510-530 x 75/70 x 10mm and 510-530 x 72/62 x 10mm. The Certificate of Origin notes only "Nashville, TN (Airport)" as a final destination.

*The Lacey Act Declaration, prepared for the Department of Agriculture, and submitted after the Defendant Property was inspected, reflects the true nature of the Defendant Property as HS Code 4407 and therefore, the Defendant Property (harvested in India) is prohibited from export from the Republic of India.*

23. The USDA form PPQ 505, also known as the Lacey Act Declaration, for the Defendant Property reflected the signature of Natalie Swango on June 17, 2011. However, it was not submitted to CBP until after the Defendant Property had been inspected and a request was made to Luthier for the declaration as required. This import document identified the final consignee for the Defendant Property as "Gibson Guitar" in Nashville, Tennessee, "ATTN: HERB JENKINS". In addition, the Lacey Act Declaration stated that the plant product imported was "Ebony fingerboards for guitars: *Diospyros ebenum*, harvested in India."

24. The HS code listed on the Lacey Act Declaration for the shipment of Defendant Property was "4407 99 96". This 4407 series of HS codes describes "Wood sawn or chipped lengthwise, sliced or peeled, whether or not planed, sanded, or end jointed, or a thickness exceeding 6mm". The imported ebony was physically, inspected by FWS Inspector Theurer, and CBP Office/Agriculture Specialist Raina Dodson and was found to be in the form of sawn wood as classified under HS code 4407. Based on the Indian law set forth earlier in this affidavit, I am aware that this true HS code makes it clear that the Defendant Property is contraband or illegal to possess.

25. On June 30, Natalie Swango submitted a second Lacey Act Declaration to CBP for the same shipment of Defendant Property in order to change the declared HS code to HS code 9209 92 0000.

10

26. Gibson Guitar Corp. ("Gibson") has been the subject of an investigation concerning the importation of contraband or illegal ebony wood from Madagascar and from India. Based on this investigation I am aware that Gibson utilizes Theodor Nagel, GMBH ("Nagel") as a supplier of ebony wood. I am also aware from my investigation that Luthiers Mercantile is owned by the owners of Nagel. Further, Nagel is listed as the supplier on the invoice to Luthiers Mercantile for the Defendant Property. Further, I am aware that previous orders for ebony wood have originated from Gibson's offices in Nashville, Tennessee when the final destination of the ebony wood is Nashville, Tennessee. CEO Juszkiewicz stated in a recorded interview on September 1, 2011, "There was a shipment seized at our broker about a month ago. And somebody had filled in the wrong import category on the paperwork." I am aware that this seizure is the only seizure involving Gibson's supplier during the stated time frame. Further, in this particular case involving the Defendant Property, I know that the final destination is Nashville, Tennessee and that Herb Jenkins is the contact for the Defendant Property, and Herb Jenkins is Senior Purchasing Manager for Gibson in Nashville, Tennessee. Therefore, based on the foregoing facts and my training and experience, I believe that the order for the Defendant Property originated in Nashville, Tennessee.

27. Gibson CEO Henry Juszkiewicz has made numerous statements to the press regarding Gibson's purchase of ebony wood. In an on-camera recorded interview on August 25, 2011, Juszkiewicz stated "uh specifically we're talking about fingerboard blanks which are partially finished fingerboards" and that

11

"Because Indian law in this case, we are talking about Indian rosewood and ebony. Indian law requires all the work be done in India. So in other words, if they finish the fingerboard in India and send it here that's ok., but if they send it partially finished and American workers work on it, that's not o.k.. That's illegal by Indian law.". CEO Juszkiewicz also stated, "So, the Lacey Act I was told and this is hearsay that, I was told, it was passed by a congressperson of Oregon at the behest of lumber unions. Lumber unions who wanted to achieve American companies to buy American lumber. So that's not a national objective. That's not an environment. That's not mom and apple pie." Based on these statements, it is clear that Gibson understands the purpose of the Lacey Act, and understands that the Defendant Property, which is fingerboard blanks, are not finished fingerboards and thus Gibson is aware that its order for fingerboard blanks was an order for contraband ebony wood or ebony wood which is illegal to possess.

### *The Defendant Property is forfeitable*

28. Based on the foregoing facts, the investigation, my background and my experience and training, I submit that the Defendant Property is a product which conforms to the HS code 4407 and is therefore "Prohibited" and "Not permitted to be exported" from the Republic of India. Therefore, the export of the Defendant Property from the Republic of India under a false HS code 9209.92.00 is unlawful as is the import or introduction of the Defendant Property into the United States under HS code 4408.90.0195. Further, through the use of the false HS codes the Defendant Property was smuggled or clandestinely exported from India, and smuggled or clandestinely imported and introduced into the United States.

29. Based on the foregoing facts, the investigation, my background and my experience and training, and pursuant to 18 U.S.C. § 983((a)(1)(F) and 983(d)(4) because the Defendant Property is contraband or illegal to possess, the Government "shall not be required to return contraband or other property that the person from whom the property was seized may not legally possess."

30. Based on the foregoing facts, the investigation, my background and my experience and training, the Defendant Property is forfeitable pursuant to:

(a) 16 U.S.C. § 3374 and 18 U.S.C. § 983(d)(4) because

(1) the Defendant Property is property unlawfully exported, imported or transported in violation of U.S.C. § 3372(a)(2)(B)(iii), and

(2) upon export and import, the Defendant Property was the subject of a false record, account or label for, or false identification in regard to its export from India and its import into the United States in violation of 16 U.S.C. § 3372(d).

(b) 18 U.S.C. § 545 because the Defendant Property is property which is contraband or illegal to possess and was unlawfully imported or brought into the United States contrary to law.

(c) 19 U.S.C. § 1595a(c)(1)(A) because the Defendant Property was smuggled, or clandestinely imported, or introduced into the United States through the use of false HS codes in violation of 18 U.S.C. § 545.

13

All of the above information is true and correct to the best of my knowledge.

_____
Kevin L. Seiler
Special Agent
U.S. Fish & Wildlife Service

Sworn to and subscribed before me on the 27th day of September, 2011.

_____
Notary Public



My commission expires: 11/5/14

 

## 5.2 Observations on the road

The road linking Antjahamarina with Antalaha is nearly impassable, due to degradation caused by the frequent transport of rosewood over the last six months. Timber is therefore transported on a different road, through the village of Ambinanymarambo, where the wood has to be ferried across another river. In order to avoid these logistical problems, wood is also transported directly to Antalaha by boat, where it is unloaded on the beach of Sahanta, some 20km south of the town.

En route to the Park, on 18 August 2009, the investigation team observed two tractors, at 1440hrs and 1510hrs (registration plates 7583DB and 3580DB), passing the spot where the team had stopped to inspect wood being carried onto the beach from two boats moored close to the shore (*MS Gidi* and *MS Felestine*).

The tractors, the drivers of which claimed that the vehicles belonged to the company of Roger Thu Nam, carried 30 and 24 logs of rosewood respectively. Some kilometres further down the road, the team stopped a shared taxi (*taxi brousse*) carrying 12 logs, barely hidden under a tarpaulin. The driver claimed that Mme. Patricia Soa was the owner of the wood. However, these claims could not be substantiated by the investigation team. On the way back from the forest, the team observed three more minivans with logs on their way to Antalaha, again in broad daylight.


Photo 9: Road between Antjahamarina and Ambalabe


Photo 10: Taxi brousse carrying rosewood


Photo 11: Landing of rosewood at Sahanta beach


Photo 12: Pickup with rosewood, south of Antalaha

Exhibit A

Home | Contact Us | Member Login | Search | Sitemap | FAQ | RSS

Public    Members    Events    Learning    Bookshop    SW    CEN    IPM

**Nomenclature - Overview > What is the Harmonized System (HS)?**

About us
Nomenclature
Valuation
Origin
Enforcement and Compliance
Procedures and Facilitation
Capacity Building
Research
Media
Online Services
Links
Document DB
Calls for Tender
NEW Vacancy available
Members' Corner

The Harmonized Commodity Description and Coding System generally referred to as "Harmonized System" or simply "HS" is a multipurpose international product nomenclature developed by the World Customs Organization (WCO).

It comprises about 5,000 commodity groups; each identified by a six digit code, arranged in a legal and logical structure and is supported by well-defined rules to achieve uniform classification. The system is used by more than 200 countries and economies as a basis for their Customs tariffs and for the collection of international trade statistics. Over 98 % of the merchandise in international trade is classified in terms of the HS.

The HS contributes to the harmonization of Customs and trade procedures, and the non-documentary trade data interchange in connection with such procedures, thus reducing the costs related to international trade.

It is also extensively used by governments, international organizations and the private sector for many other purposes such as internal taxes, trade policies, monitoring of controlled goods, rules of origin, freight tariffs, transport statistics, price monitoring, quota controls, compilation of national accounts, and economic research and analysis. The HS is thus a universal economic language and code for goods, and an indispensable tool for international trade.

The Harmonized System is governed by "The International Convention on the Harmonized Commodity Description and Coding System". The official interpretation of the HS is given in the Explanatory Notes (5 volumes in English and French) published by the WCO. The Explanatory Notes are also available on online and on CD-ROM, as part of a commodity database giving the HS classification of more than 200,000 commodities actually traded internationally.

The maintenance of the HS is a WCO priority. This activity includes measures to secure uniform interpretation of the HS and its periodic updating in light of developments in technology and changes in trade patterns. The WCO manages this process through the Harmonized System Committee (representing the Contracting Parties to the HS Convention), which examines policy matters, takes decisions on classification questions, settles disputes and prepares amendments to the Explanatory Notes. The HS Committee also prepares amendments updating the HS every 5 – 6 years.

Decisions concerning the interpretation and application of the Harmonized System, such as classification decisions and amendments to the Explanatory Notes or to the Compendium of Classification Opinions, become effective two months after the approval by the HS Committee. These are reflected in the amending supplements of the relevant WCO Publications.

More information?     Print

Broken link reporter

Copyright©2011 World Customs Organization.
All rights reserved.

The WCO documents require Acrobat Reader 8.0 and above to be viewed.



Knowledge
Connaissance

**Search**

This website     [GO]

Google     [GO]

**What's New!**

**August 2011**
• Bhutan enhances disaster management

**July 2011**
• WCO shares Capacity Building approach with African Revenue and Tax Agencies
• Maldives embraces a wider Customs focus
• India AEO launch
• SG speech at PIM in Sri Lanka
• 77th Contracting Party to the RKC

**Not to be missed!**



> Latest edition <



6th Picard Conference
>more info<



2011 World Customs and Trade Forum
>more info<

Exhibit B

Exhibit 3

List of countries, territories or customs or economic unions applying the Harmonized System.

**138 countries and the European Union have signed the HS Convention and are Contracting Parties (24 May 2011)**

| | | |
|---|---|---|
| Afghanistan x | Albania x | Algeria + |
| Andorra + | Angola + | Antigua & Barbuda x |
| Argentina + | Armenia + | Australia + |
| Austria + | Azerbaijan + | Bahamas x |
| Bahrain + | Bangladesh + | Barbados x |
| Belarus + | Belgium + | Belize x |
| Benin + | Bermuda x | Bhutan + |
| Bolivia + | Bosnia and Herzegovina x | Botswana + |
| Brazil + | Brunei Darussalam x | Bulgaria + |
| Burkina Faso + | Burundi x | Cambodia + |
| Cameroon + | Canada + | Cape Verde + |
| Central African Rep. + | Chad + | Chile + |
| China + | Colombia + | Comoros x |
| Congo (Dem. Rep. of) + | Congo (Rep. of) + | Cook Islands x |
| Costa Rica x | Côte d'Ivoire + | Croatia + |
| Cuba + | Cyprus + | Czech Republic + |
| Denmark + | Djibouti x | Dominica x |
| Dominican Rep. + | Ecuador + | Egypt + |
| El Salvador x | Equatorial Guinea x | Eritrea + |
| Estonia + | Ethiopia + | Fiji + |
| Finland + | France + | Gabon + |
| Gambia x | Georgia + | Germany + |
| Ghana + | Greece + | Grenada x |
| Guatemala x | Guinea + | Guinea Bissau x |
| Guyana x | Haiti + | Honduras x |
| Hong Kong, China x | Hungary + | Iceland + |
| India + | Indonesia + | Iran + |
| Ireland + | Israel + | Italy + |
| Jamaica x | Japan + | Jordan + |
| Kazakhstan + | Kenya + | Kiribati x |
| Korea (Rep.) + | Kuwait + | Kyrgyzstan + |
| Laos x | Latvia + | Lebanon + |
| Lesotho + | Liberia + | Libyan Arab Jamahiriya + |
| Liechtenstein x | Lithuania + | Luxembourg + |
| Macau, China x | Madagascar + | Malawi + |
| Malaysia + | Maldives + | Mali + |
| Malta + | Marshall Islands x | Mauritania + |
| Mauritius + | Mexico + | Micronesia x |
| Moldova + | Mongolia + | Montenegro + |
| Morocco + | Mozambique x | Myanmar + |
| Namibia + | Nepal + | Netherlands + |
| New Caledonia (French Terr.) x | New Zealand + | Nicaragua x |
| Niger + | Nigeria + | Niue x |

| | | |
|---|---|---|
| Norway + | Oman x | Pakistan + |
| Palau x | Panama + | Papua New Guinea x |
| Paraguay + | Peru + | Philippines + |
| Poland + | Polynesia (French Terr.) x | Portugal + |
| Qatar + | Romania + | Russia + |
| Rwanda + | Saint Kitts and Nevis x | Saint Lucia x |
| Saint Pierre and Miquelon (French Terr.) x | Saint Vincent and the Grenadines x | Samoa x |
| Saudi Arabia + | Senegal + | Serbia + |
| Seychelles x | Sierra Leone x | Singapore + |
| Slovakia + | Slovenia + | Solomon Islands x |
| South Africa + | Spain + | Sri Lanka + |
| Sudan + | Suriname x | Swaziland + |
| Sweden + | Switzerland + | Syrian Arab Rep. + |
| Tajikistan + | Tanzania + | Thailand + |
| The Former Yugoslav Republic of Macedonia + | Togo + | Tonga x |
| Trinidad and Tobago x | Tunisia + | Turkey + |
| Turkmenistan x | Tuvalu x | Uganda + |
| Ukraine + | United Arab Emirates + | United Kingdom + |
| United States + | Uruguay x | Uzbekistan + |
| Vanuatu x | Venezuela + | Vietnam + |
| Wallis and Futuna (French Terr.) x | Yemen + | Zambia + |
| Zimbabwe + | | |

European Union +

Andean Community (CAN) +x

Caribbean Community (CARICOM) +x

Common Market for Eastern and Southern Africa (COMESA) +x

Common Wealth of the Independent States (CIS) +x

Economic and Monetary Community of Central Africa (CEMAC) (former CACEU) +x

Economic Community of Western African States (ECOWAS) +x

Gulf Co-operation Council (GCC) +x

Latin American Integration Association (LAIA) +x

Southern Cone Common Market (MERCOSUR) +x

West African Economic and Monetary Union (UEMOA) +x


**Notes :**

+ Acceptance (i.e., Contracting Party to the Harmonized System Convention).

x Indicates application only.

+x Some Members are Contracting Parties to the Harmonized System Convention.